IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

| | | |
|---|---|---|
| WILLIAM MONTAQUE,<br>    Plaintiff, | ) ) ) | |
| v. | ) ) | Civil No. 3:14cv812 (JAG) |
| CAROLYN W. COLVIN<br>Acting Commissioner of Social Security,<br>    Defendant. | ) ) ) ) ) | |

## REPORT AND RECOMMENDATION

William Montaque ("Plaintiff") is forty-nine years old and previously worked as a

laborer, cook, school custodian and heavy equipment operator. On October 21, 2011, Plaintiff

protectively applied for Social Security Disability Insurance Benefits ("DIB") and Supplemental

Security Income ("SSI") under the Social Security Act ("Act"), alleging disability from

degenerative disc disease of the cervical and lumbar spine areas with an alleged onset date of

November 1, 2010. Plaintiff later amended his alleged onset date to October 1, 2011. Plaintiff's

claims were denied both initially and upon reconsideration. On August 6, 2013, Plaintiff

(represented by counsel) appeared before an Administrative Law Judge ("ALJ") for an

administrative hearing. The ALJ subsequently denied Plaintiff's claims in a written decision

dated August 13, 2013. On October 3, 2014, the Appeals Council denied Plaintiff's request for

review, rendering the ALJ's decision the final decision of the Commissioner of Social Security.

Plaintiff now appeals the ALJ's decision pursuant to 42 U.S.C. §405(g), arguing that the

ALJ erred in assessing Plaintiff's credibility and the opinions of one of his treating physicians,

Dr. Adam Shimer. The parties have submitted cross-motions for summary judgment, which are

now ripe for review. Having reviewed the parties' submissions and the entire record in this case, the Court is now prepared to issue a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). For the reasons that follow, the Court recommends that Plaintiff's Motion for Summary Judgment (ECF No. 12) be GRANTED, that Defendant's Motion for Summary Judgment (ECF No. 14) be DENIED and that the final decision of the Commissioner be VACATED and REMANDED.

## I. BACKGROUND

Because Plaintiff challenges the ALJ's decision, Plaintiff's education, work history, medical history, function report and testimony are summarized below.

### A. Education and Work History

Plaintiff was forty-six years old when he applied for DIB and SSI. (R. at 173.) Plaintiff completed school through the tenth grade. (R. at 196.) Beginning in 1996, Plaintiff worked as a laborer, cook and school custodian. (R. at 261.) From 2001 to 2010, Plaintiff worked as a heavy equipment operator for three paving companies. (R. at 261.)

### B. Medical Records

#### 1. Lloyd Moss Free Clinic

On September 30, 2010, Plaintiff sought treatment at the Lloyd F. Moss Free Clinic ("Moss Free Clinic") for lower back pain and a cough. (R. at 310.) After an examination, the treating physician diagnosed Plaintiff with a cough, shortness of breath, tobacco abuse and scoliosis. (R. at 310.) As a result of the diagnosis, the treating physician referred Plaintiff for an EKG, complete blood count and x-ray on his spine and chest. (R. at 310.) Providers recommended that Plaintiff discontinue his tobacco use with the help of medication, a patch or tobacco cessation classes. (R. at 310.)

On October 1, 2010, the results of Plaintiff's chest x-ray showed no focal abnormal opacity, pleural effusion or cardiopulmonary disease. (R. at 332.) However, Plaintiff's chest x-ray did show moderate to marked disc degeneration and intervertebral disc space narrowing at the L2-L3, L3-L4 and L4-L5 levels. (R. at 333.)

On October 12, 2010, Plaintiff returned to the Moss Free Clinic for another appointment and complained about pain radiating down both legs. (R. at 309.) After an examination, the treating physician referred Plaintiff for physical therapy and prescribed Diclofenac and Flexeril. (R. at 309.)

On December 14, 2010, Plaintiff underwent an initial physical therapy evaluation at the Moss Free Clinic. (R. at 317.) Plaintiff complained of pain associated with prolonged standing, as well as bilateral tingling in his lower extremities. (R. at 317.) The physical therapist described Plaintiff's sitting and standing balance as "good." (R. at 318.) The physical therapist also ranked Plaintiff's hip, knee and ankle strength at 5/5 and Plaintiff's abdominal strength at 3/5. (R. at 318.) Ultimately, the physical therapist categorized Plaintiff's potential for treatment as "good." (R. at 317.)

On January 11, 2011, Plaintiff attended physical therapy, complaining of pain and stiffness in his hips, especially in the morning. (R. at 316.) Plaintiff also noted that the pain felt better throughout the day and did not feel severe at night. (R. at 316.) A straight leg-raising test yielded negative results. (R. at 316.)

On January 25, 2011, an x-ray of Plaintiff's cervical spine showed slight degenerative anterolisthesis of C6 on C7. (R. at 331.) The x-ray also revealed moderate disc space narrowing at C4-C5 and C5-C6, as well as mild disc space narrowing at C3-C4 associated with endplate

3

sclerosis and marginal osteophytes. (R. at 331.) Dr. James Sprinkle opined that Plaintiff

suffered from "cervical spondylosis." (R. at 331.)

On March 11, 2011, an MRI revealed some degenerative marrow signal changes

throughout the lumber spine. (R. at 329.) Plaintiff showed some loss of the normal lumbar

lordosis, but no severe spondylolisthesis. (R. at 329.) The MRI detected disc herniation and

posterior hypertrophic changes at L4-L5 that contributed to severe central canal stenosis, severe

left foraminal narrowing and moderate right foraminal narrowing. (R. at 329.) Broad-based disc

changes at the L3-L4 level also contributed to mild central canal stenosis and bilateral foraminal

narrowing. (R. at 329.)

On April 11, 2011, Plaintiff complained of pain in his buttocks. (R. at 337.) A provider

at the Moss Free Clinic diagnosed Plaintiff with spinal stenosis based on a recent MRI. (R. at

337.) On July 7, 2011, the Moss Free Clinic referred Plaintiff to the University of Virginia Spine

Clinic ("UVA") after Plaintiff continued to complain of back pain. (R. at 368.)

2. University of Virginia Spine Clinic

On August 30, 2011, Adam Shimer, M.D. conducted a physical evaluation of Plaintiff.

(R. at 378.) Plaintiff complained of pain in his lower back, bilateral buttock and posterior thigh.

(R. at 378.) Plaintiff also noted that his pain increased after standing or walking, but improved in

a seated position. (R. at 378.) Plaintiff contended that neither physical therapy nor his

medication — Flexeril and NSAIDs — helped the pain. (R. at 378.) Dr. Shimer's physical

examination revealed that Plaintiff ambulated without assistance, had a strong heel-to-toe walk,

and had pain with lumbar extension but no palpable tenderness. (R. at 379.) Plaintiff's sensation

remained intact to all bilateral lower extremity dermatome. (R. at 379.) The physical

examination showed that Plaintiff retained full strength in his hip flexors, quads, hamstrings,

4

ankle dorsiflexor, extensor hallucis longus muscle and ankle plantarflexor. (R. at 379.) Dr. Shimer opined that Plaintiff suffered lumbar stenosis L3-5 and bilateral posterior thigh pain. (R. at 379.) He also recommended that Plaintiff be considered for possible lumbar epidural steroid injections ("ESI"). (R. at 379.)

On September 8, 2011, Susan Miller, M.D. treated Plaintiff for lower back pain. (R. at 375.) Plaintiff complained of pain in his lower back, bilateral buttock and posterior thigh. (R. at 375.) Plaintiff tested positive for fatigue, back pain, neurological weakness and sleep disturbance. (R. at 377.) Dr. Miller determined that Plaintiff's cardiovascular, gastrointestinal and hematological system tests yielded negative results. (R. at 377.) Dr. Miller recommended a lumbar ESI, tobacco cessation and prescribed Neurontin. (R. at 378.) Plaintiff declined to pursue the lumbar ESI because of his hesitation and fear of needles. (R. at 378.)

On November 18, 2011, Plaintiff followed-up with Dr. Miller. (R. at 373.) Plaintiff's burning pain continued, but Neurontin controlled his symptoms. (R. at 373.) Dr. Miller increased Plaintiff's dosage of Neurontin and again recommended lumbar ESI, which Plaintiff refused for a second time. (R. at 374.)

On December 18, 2011, Plaintiff had a second MRI of his lumbar spine. (R. at 397.) Plaintiff's MRI revealed severe central canal and severe bilateral neuroforaminal stenosis at L4-L5, as well as a left foraminal annular tear, moderate central canal stenosis at L3-L4 secondary to diffuse disc bulge and congenitally narrow central canal from L2 through L5. (R. at 397.)

On December 19, 2011, Dr. Miller reviewed the results of Plaintiff's MRI and diagnosed him with degenerative disc disease/spondylosis with significant L4-L5 stenosis and radicular low back pain. (R. at 395.) Dr. Miller also noted that "no red flags" existed with Plaintiff's strength and emphasized that his pain improved with Neurontin. (R. at 395.)

On January 30, 2012, Dr. Miller examined Plaintiff and recorded a mildly decreased range of motion in his lumbar back. (R. at 392.) During the examination, Plaintiff declined a surgical consultation, but agreed to a lumbar ESI. (R. at 393.) On February 15, 2012, Plaintiff received a fluoroscopic guided spinal injection from Dr. Miller. (R. at 396.)

On April 24, 2012, Dr. Miller reported to the Moss Free Clinic that the ESI relieved Plaintiff's pain for a few days. (R. at 403.) Dr. Miller also recommended a second and third ESI. (R. at 406.) Dr. Miller noted that Plaintiff continued to decline surgical consultation and that she would discuss the possibility of surgery further if he received suboptimal relief from future lumbar ESIs. (R. at 406.) On May 3, 2012 and May 31, 2012, Plaintiff received his second and third ESI respectively. (R. at 451-52.)

On May 31, 2012, Dr. Miller ordered an MRI of Plaintiff's cervical spine. (R. at 421.) The radiologist found mild to moderate central canal stenosis and moderate to severe bilateral neuroforaminal stenosis at C3-C4, C4-C5, C5-C6 and C6-C7. (R. at 422.)

On September 17, 2012, Plaintiff informed Dr. Shimer that his series of lumber ESIs had not provided lasting relief. (R. at 447.) Dr. Shimer noted that he discussed the possibility of surgery with Plaintiff and explained possible risks, including bleeding, infection, cerebrospinal fluid leak, injury to a nerve, leaving part of his leg weak or numb for life, chronic low back pain, junctional stenosis and pseudarthrosis. (R. at 447.) Dr. Shimer reported that Plaintiff understood the risks associated with surgery and did not want to pursue surgery at that time. (R. at 447.)

On March 20, 2013, Plaintiff returned to Dr. Shimer, reporting "incapacitating" right leg pain. (R. at 446.) Dr. Shimer recommended that Plaintiff undergo another MRI to consider surgical intervention and insisted that Plaintiff stop smoking. (R. at 446.) Plaintiff sought

disability at that time and Dr. Shimer informed Plaintiff that he would not support disability past the three-month postoperative time. (R. at 446.)

On April 8, 2013, Plaintiff's MRI of his spine showed no change to the trace anterolisthesis of L3 on L5 from his previous MRI conducted on December 18, 2011. (R. at 443.) Dr. Shimer opined that Plaintiff showed advanced multilevel spondylosis, severe central canal stenosis and bilateral foraminal stenosis, moderate to severe central canal stenosis at L3-L4 and moderate narrowing at L2-L3 due to a generalized disc bulge, congenitally relatively narrow canal and prominent posterior epidural fat. (R. at 443.)

C. Function Report

On May 5, 2011, Plaintiff completed a Function Report. (R. at 279-86.) Plaintiff lived in a house with friends. (R. at 279.) Plaintiff's daily routine included waking up, eating breakfast, taking pills, watching television and completing therapy. (R. at 279.) Plaintiff considered performing activities, such as cutting the grass or performing yard work, if his therapy helped. (R. at 279.)

Plaintiff stated that he fed his daughter's dog and walked the dog if his back did not hurt. (R. at 280.) Plaintiff's mother lived next door and cooked for him. (R. at 280.) Plaintiff completed chores around the house, including cutting the grass once a week and taking the trash out as needed. (R. at 281.) Plaintiff went outside every day and shopped for food approximately thirty minutes per week. (R. at 282.) Plaintiff listed fishing and hunting as his hobbies, but also noted that he did not perform these activities often due to his back pain. (R. at 283.) Plaintiff listed that he talked to be social, but listed no place where he visited on a regular basis. (R. at 283.)

7

Plaintiff reported that his back hurt so badly that he tossed and turned all night. (R. at 280.)  When Plaintiff dressed, he had to bend over slowly to put on socks and strained to use the bathroom. (R. at 280.)  Plaintiff reported that his condition affected his ability to lift, squat, bend, stand, reach, walk, sit, kneel and climb stairs. (R. at 284.)  Plaintiff could walk seventy-five yards before needing to stop and rest for approximately ten minutes. (R. at 284.)  Finally, Plaintiff recorded that he owned a brace/splint and wore it while cutting grass or walking every day. (R. at 285.)

On December 6, 2011, Plaintiff completed a second Function Report. (R. at 218-25.)  Plaintiff still lived in a house with friends. (R. at 218.)  Plaintiff's daily routine now consisted of waking up, eating breakfast, taking medication, seeing if he could go for a walk and sitting on the porch. (R. at 218.)

Plaintiff reported that he tried to do chores around the house until his back started to hurt and he had to sit down. (R. at 220.)  Plaintiff went for a walk outside every day to get fresh air and sat on the porch approximately three to four days a week. (R. at 222.)  Plaintiff no longer listed hunting or fishing as hobbies, but added that he watched television for a hobby. (R. at 222.)  Plaintiff noted that he could not perform the activities that he used to perform, because standing made his back hurt. (R. at 223.)

Plaintiff's condition affected his sleep due to his back pain. (R. at 219.)  Plaintiff again recorded that his condition affected his ability to lift, squat, bend, stand, walk, sit and climb stairs. (R. at 223.)  Plaintiff no longer indicated that his condition affected his ability to reach or kneel. (R. at 223.)  Plaintiff noted that when he tried to perform the activities listed, his back hurt, his legs gave out and he had to sit down for awhile. (R. at 223.)  Plaintiff stated that he could walk seventy-five feet before he needed to stop and rest. (R. at 223.)

D. Plaintiff's Testimony

On August 6, 2013, Plaintiff (represented by counsel) testified during a hearing before the ALJ. (R. at 22-51.) Plaintiff was forty-seven years old and lived with his girlfriend. (R. at 25-26.) Plaintiff had a twenty-five-year-old daughter who occasionally stayed with Plaintiff. (R. at 26.) Plaintiff completed school through the ninth grade and stated that he could read and write "a little." (R. at 26.) Plaintiff did not pay rent, because his aunt let him stay in her house for free. (R. at 27.) Plaintiff received food stamps for financial aid. (R. at 27.)

Plaintiff last worked in 2010, performing asphalt work. (R. at 27.) Before he worked at the paving company, Plaintiff worked as an equipment operator for the City of Fredericksburg Public Works. (R. at 28.) Both jobs required Plaintiff to lift objects with a maximum weight of about two hundred pounds. (R. at 28.) Plaintiff also worked as a school custodian where he lifted no more than about five to ten pounds. (R. at 29.) For the past fifteen years, Plaintiff had gone back and forth between asphalt work and restaurant work. (R. at 29.)

Plaintiff testified that he could no longer work because of his back pain that radiated into his legs. (R. at 29.) Plaintiff stated that his back pain remained constant and rated the pain as a seven or an eight out of ten. (R. at 30.) Plaintiff revealed that he took Tramadol, muscle relaxers and Ibuprofen for his back pain, but they helped very little. (R. at 30.) After Plaintiff took his medication, his back pain decreased to about a seven or eight out of ten. (R. at 32.)

Plaintiff testified that the he felt pain mostly in his right leg. (R. at 31.) Plaintiff described the pain as sharp that led to leg cramps. (R. at 31.) The leg cramps occurred about every other day and that the pain in his legs felt more severe than his back pain. (R. at 31.) Plaintiff ranked his leg pain as a nine out of ten. (R. at 31.)

Plaintiff testified that he could sit and stand comfortably for about thirty minutes. (R. at 33.) Plaintiff could not lift more than three pounds. (R. at 33.) Plaintiff described feeling pain upon waking up in the morning that increased with weather conditions such as coldness and rain. (R. at 33-34.) Plaintiff would lay down about four to five hours per day in an attempt to relieve his pain. (R. at 34.)

Plaintiff testified that he took a shower every other day and could dress himself. (R. at 36.) Plaintiff's girlfriend completed the cooking at the house, because Plaintiff did not know how to cook and Plaintiff's neighbor completed most of the housework. (R. at 36-37.) Plaintiff drove to the doctor's office once or twice per month and to the grocery store once every couple of weeks. (R. at 38.) Plaintiff tried to go outside every day, but would often return indoors, because he could not sit on his porch chairs for an extended period of time. (R. at 38.) Plaintiff spent six to eight hours per day watching television. (R. at 38.)

Plaintiff last mowed his lawn about two or three times in 2012 and last mowed the church lawn two years ago. (R. at 41.) Before Plaintiff's back started hurting, it took him twenty minutes to mow his lawn. (R. at 42.) After Plaintiff's back started hurting, it took him an hour to mow his lawn. (R. at 42.)

When asked about his decision to put off surgery, Plaintiff emphasized that he did not reject surgery outright and referenced the injections that he received. (R. at 35.) Plaintiff also revealed that he feared surgery due to Dr. Shimer's description of the surgical details. (R. at 35.) Plaintiff stated that he no longer received injections, because they did not help his pain. (R. at 36.) Specifically, Plaintiff claimed that his doctor indicated to him that he would not have the operation if he was in Plaintiff's position. (R. at 43.) However, at the end of questioning, Plaintiff stated that he would pursue surgery if his pain persisted. (R. at 47.)

## II. PROCEDURAL HISTORY

On October 21, 2011, Plaintiff filed applications for DIB and SSI, claiming disability due to a disc in his back and pain in his leg and neck with an alleged onset date of November 1, 2010. (R. at 169-80.) The claims were denied initially on January 20, 2012, and upon reconsideration on March 28, 2012. (R. at 90-95, 101-14.) On June 7, 2013, Plaintiff amended his alleged onset date to October 1, 2011. (R. at 188.) Plaintiff filed a written request for a hearing on April 4, 2012, and the ALJ held a hearing on August 6, 2013, during which Plaintiff (represented by counsel) and a VE testified. (R. at 20, 115.) On August 13, 2013, the ALJ issued a written opinion, denying Plaintiff's claim and concluding that Plaintiff was not disabled under the Act, because Plaintiff could perform other work that existed in the national and local economies. (R. at 7-19.) On August 29, 2013, Plaintiff requested that the Appeals Council review the ALJ's decision. (R. at 6.) On October 3, 2014, the Appeals Council denied Plaintiff's request for review, rendering the ALJ's decision the final decision of the Commissioner subject to judicial review by this Court. (R. at 1-5.)

## III. QUESTIONS PRESENTED

1. Did the ALJ err in assessing Plaintiff's credibility?

2. Did the ALJ err in considering Dr. Shimer's opinion?

## IV. STANDARD OF REVIEW

In reviewing the Commissioner's decision to deny benefits, the Court is limited to determining whether substantial evidence in the record supports the Commissioner's decision and whether the proper legal standards were applied in evaluating the evidence. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012) (citing *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005)). Substantial evidence is more than a scintilla, is less than a preponderance and is the

kind of relevant evidence that a reasonable mind could accept as adequate to support a conclusion. *Hancock*, 667 F.3d at 472; *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996).

To determine whether substantial evidence exists, the Court must examine the record as a whole but may not "undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [ALJ]." *Hancock*, 667 F.3d at 472 (quoting *Johnson*, 434 F.3d at 653). In considering the decision of the Commissioner based on the record as a whole, the Court must "take into account whatever in the record fairly detracts from its weight." *Breeden v. Weinberger*, 493 F.2d 1002, 1007 (4th Cir. 1974) (quoting *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 488 (1951)). The Commissioner's findings as to any fact, if substantial evidence in the record supports the findings, are conclusive and must be affirmed regardless of whether the reviewing court disagrees with such findings. *Hancock*, 667 F.3d at 477. If substantial evidence in the record does not support the ALJ's determination or if the ALJ has made an error of law, the Court must reverse the decision. *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A sequential evaluation of a claimant's work and medical history is required to determine if a claimant is eligible for benefits. 20 C.F.R. §§ 404.1520(b), 416.920(b); *Mastro v. Apfel*, 270 F.3d 171, 177 (4th Cir. 2000). An ALJ conducts the analysis for the Commissioner, and it is that process that a court must examine on appeal to determine whether the correct legal standards were applied, and whether substantial evidence in the record supports the resulting decision of the Commissioner. *Mastro*, 270 F.3d at 176-77.

The first step in the sequence is to determine whether the claimant was working at the time of the application and, if so, whether the work constituted "substantial gainful activity" ("SGA"). 20 C.F.R. §§ 404.1520(b), 416.920(b). SGA is work that is both substantial and

gainful as defined by the Agency in the C.F.R.  Substantial work activity is "work activity that involves doing significant physical or mental activities.  Your work may be substantial even if it is done on a part-time basis or if you do less, get paid less, or have less responsibility than when you worked before."  20 C.F.R. § 404.1572(a).  Gainful work activity is work activity done for "pay or profit, whether or not a profit is realized."  20 C.F.R. § 404.1572(b).  Taking care of oneself, performing household tasks or hobbies, therapy or school attendance, and the like, are not generally considered substantial gainful activities.  20 C.F.R. § 404.1572(c).  If a claimant's work constitutes SGA, the analysis ends and the claimant must be found "not disabled," regardless of any medical condition.  *Id.*

If the claimant establishes that he did not engage in SGA, the second step of the analysis requires him to prove that he has "a severe impairment . . . or combination of impairments which significantly limit[s] [his] physical or mental ability to do basic work activities."  20 C.F.R. 404.1572(c); *see also* 20 C.F.R. § 404.1520(c).  To qualify as a severe impairment that entitles one to benefits under the Act, it must cause more than a minimal effect on one's ability to function.  20 C.F.R. § 404.1520(c).

At the third step, if the claimant has an impairment that meets or equals an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (listing of impairments) and lasts, or is expected to last, for twelve months or result in death, it constitutes a qualifying impairment and the analysis ends.  20 C.F.R. §§ 404.1520(d), 416.920(d).  If the impairment does not meet or equal a listed impairment, then the evaluation proceeds to the fourth step in which the ALJ must determine whether the claimant can return to his past relevant work[1] based on an assessment of

---

[1]     Past relevant work is defined as SGA in the past fifteen years that lasted long enough for an individual to learn the basic job functions involved.  20 C.F.R. §§ 404.1520(a), 416.920(a).

the claimant's RFC[2] and the "physical and mental demands of work [the claimant] has done in the past." 20 C.F.R. §§ 404.1520(e), 416.920(e). If such work can be performed, then benefits will not be awarded. *Id.* The burden of proof remains with the claimant through step four of the analysis, such that he must prove that his limitations preclude him from performing his past relevant work. *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *Hancock*, 667 F.3d at 472.

However, if the claimant cannot perform his past work, the burden then shifts to the Commissioner at the fifth step to show that, considering the claimant's age, education, work experience and RFC, the claimant is capable of performing other work that is available in significant numbers in the national economy. 20 C.F.R. §§ 404.1520(f), 416.920(f); *Powers v. Apfel*, 207 F.3d 431, 436 (7th Cir. 2000) (citing *Yuckert*, 482 U.S. at 146 n.5). The Commissioner can carry her burden in the final step with the testimony of a VE. When a VE is called to testify, the ALJ's function is to pose hypothetical questions that accurately represent the claimant's RFC based on all evidence on record and a fair description of all of the claimant's impairments, so that the VE can offer testimony about any jobs existing in the national economy that the claimant can perform. *Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989). Only when the hypothetical posed represents all of the claimant's substantiated impairments will the testimony of the VE be relevant or helpful. *Id.* If the ALJ finds that the claimant is not capable of SGA, then the claimant is found to be disabled and is accordingly entitled to benefits. 20 C.F.R. §§ 404.1520(f)(1), 416.920(f)(1).

---

[2]    RFC is defined as "an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." SSR-96-8p. When assessing the RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis, and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record. *Id.*

# V.  ANALYSIS

## A.  The ALJ's Decision

On August 6, 2013, the ALJ held a hearing during which Plaintiff (represented by counsel) and a VE testified.  (R. at 22-51.)  On August 13, 2013, the ALJ issued a written opinion denying Plaintiff's claim and concluding that Plaintiff was not disabled under the Act, because Plaintiff could perform other work that existed in the national and local economies.  (R. at 7-19.)

The ALJ followed the five-step sequential evaluation process as established by the Social Security Act in determining whether Plaintiff was disabled.  (R. at 11-12.)  At step one, the ALJ found that Plaintiff had not engaged in SGA since the amended alleged onset date of October 1, 2011.  (R. at 12.)  At step two, the ALJ determined that Plaintiff suffered the severe impairments of degenerative disc disease of the cervical and lumbosacral spine and chronic obstructive pulmonary disease.  (R. at 12.)  At step three, the ALJ determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (R. at 13.)

The ALJ further determined that Plaintiff maintained the RFC to perform light work as defined by 20 C.F.R. §§ 404.1567(b) and 416.967(b), but with certain limitations.  (R. at 13.)  Plaintiff had to alternate between sitting and standing in place every half hour.  (R. at 13.)  Plaintiff could occasionally climb ramps and stairs, but could never climb ladders, ropes or scaffolds.  (R. at 13.)  Plaintiff could occasionally balance, stoop, kneel, crouch and crawl.  (R. at 13.)  Finally, Plaintiff must avoid exposure to humidity, extreme cold, dust, fume, odors, gases and other pulmonary irritants.  (R. at 13.)

At step four, the ALJ found that Plaintiff could not perform any of his past relevant work. (R. at 17-18.) However, at step five, based upon VE testimony and answers to interrogatories and considering Plaintiff's age, education, work experience and RFC, the ALJ determined that Plaintiff could perform jobs existing in significant numbers in the national economy. (R. at 18-19.) Therefore, Plaintiff was not disabled under the Act. (R. at 19.)

Plaintiff challenges the ALJ's decision, arguing that the ALJ erred in assessing Plaintiff's credibility and in the extent to which Dr. Shimer's opinions were considered. (Pl.'s Mem. in Supp. of Mot. For Summ. J. ("Pl.'s Mem.") (ECF No. 13) at 11-25.)

B. The ALJ did not err in determining Plaintiff's credibility.

Plaintiff argues that the ALJ erred in assessing Plaintiff's credibility. (Pl.'s Mem. at 13-25.) Defendant contends that substantial evidence supports the ALJ's decision. (Def.'s Mot. for Summ. J. and Br. In Supp. Thereof ("Def.'s Mem.") (ECF No. 14) at 13-20.)

After step three of the ALJ's sequential analysis, but before deciding whether a claimant can perform past relevant work at step four, the ALJ must determine the claimant's RFC. 20 C.F.R. §§ 416.920(e)-(f), 416.945(a)(1). The RFC must incorporate impairments supported by the objective medical evidence in the record and those impairments that are based on the claimant's credible complaints. In evaluating a claimant's subjective symptoms, the ALJ must follow a two-step analysis. *Craig*, 76 F.3d at 594; *see also* SSR 96-7p; 20 C.F.R. 404.1529(a), 416.929(a). The first step is to determine whether there is an underlying medically determinable physical or mental impairment or impairments that reasonably could produce the individual's pain or other related symptoms. SSR 96-7p at 1-3. The ALJ must consider all of the medical evidence in the record. *Craig*, 76 F.3d at 594-95; SSR 96-7p at 5, n.3; *see also* SSR 96-8p at 13 ("The RFC assessment must be based on all of the relevant medical evidence in the record . . .

.""). If the underlying impairment reasonably could be expected to produce the individual's pain, then the second part of the analysis requires the ALJ to evaluate a claimant's statements about the intensity and persistence of the pain and the extent to which it affects the individual's ability to work. *Craig*, 76 F.3d at 595. The ALJ's evaluation must take into account "all the available evidence," including a credibility determination of the claimant's statements regarding the extent of the symptoms, and the ALJ must provide specific reasons for the weight given to the individual's statements. *Craig*, 76 F.3d at 595-96; SSR 96-7p at 5-6, 11.

This Court must give great deference to the ALJ's credibility determinations. *Eldeco, Inc. v. N.L.R.B.*, 132 F.3d 1007, 1011 (4th Cir. 1997). The Fourth Circuit has determined that "[w]hen factual findings rest upon credibility determinations, they should be accepted by the reviewing court absent 'exceptional circumstances.'" *Id.* (quoting *N.L.R.B. v. Air Prods. & Chems., Inc.*, 717 F.2d 141, 145 (4th Cir. 1983)). Therefore, this Court must accept the ALJ's factual findings and credibility determinations unless "'a credibility determination is unreasonable, contradicts other findings of fact, or is based on an inadequate reason or no reason at all.'" *Id.* (quoting *N.L.R.B. v. McCullough Envtl. Servs., Inc.*, 5 F.3d 923, 928 (5th Cir. 1993)).

Furthermore, Plaintiff's subjective allegations of pain do not alone provide conclusive evidence that Plaintiff is disabled. *Mickles v. Shalala*, 29 F.3d 918, 919 (4th Cir. 1994). Instead, "subjective claims of pain must be supported by objective medical evidence showing the existence of a medical impairment which could reasonably be expected to produce the actual pain, in the amount and degree, alleged by the claimant." *Craig*, 76 F.3d at 591.

In this case, the ALJ determined that Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, Plaintiff's statements

concerning the intensity, persistence and limiting effects of those symptoms were not credible. (R. at 15.) Ultimately, the ALJ diminished Plaintiff's credibility, because Plaintiff's complaints were disproportionate with the medical evidence, the conservative nature of Plaintiff's treatment and Plaintiff's own statements. (R. at 15-16.) Substantial evidence supports the ALJ's decision.

Substantial evidence supports the ALJ's decision on the basis of medical records. On December 14, 2010, an initial physical therapy evaluation revealed that Plaintiff suffered no gait deficits, had good sitting and standing balance and had negative straight leg-raising. (R. at 318.) Plaintiff's hip flexion, quadriceps strength and ankle strength were rated 5/5. (R. at 318.) Plaintiff's prognosis was good. (R. at 317.) On January 11, 2011, Plaintiff reported stiffness in his hips. (R. at 316.) As Plaintiff moved around, his pain decreased and he was "good for the rest of the day." (R. at 316.) On April 18, 2011, Plaintiff reported that his back felt okay. (R. at 342.)

On August 30, 2011, Dr. Shimer noted that Plaintiff was in no acute distress, ambulated without any assistive devices, had a strong heel-to-toe walk and was able to flex and bring his toes towards his ankles. (R. at 379.) Plaintiff had negative straight-leg raise, normal reflexes and no obvious clonus. (R. at 379.) On September 8, 2011, Dr. Miller noticed that position changes alleviated Plaintiff's pain. (R. at 375.) Plaintiff had normal range of motion and no tenderness in either hip. (R. at 377.)

On February 15, 2012, Plaintiff received a fluoroscopic guided spinal injection. (R. at 396.) On April 24, 2012, Plaintiff reported that the injection helped. (R. at 403.) Plaintiff maintained normal strength and did not experience any distress. (R. at 405.) On September 17, 2012, Dr. Shimer noted good strength, sensation, perfusion and pulses of the lower extremities and no evidence of myelopathy. (R. at 447.) Dr. Shimer admitted that he would not support

18

Plaintiff's long-term disability in general if Plaintiff's continued smoking would adversely affect the outcomes of surgery. (R. at 446.)

Substantial evidence further supports the ALJ's decision on the basis of Plaintiff's own statements. Plaintiff reported that he could drive, shop for short periods of time, take out the trash, go fishing and hunting, mow the grass and independently take care of his personal needs. (R. at 281.) Plaintiff's condition did not affect his ability to dress, bathe, shave, feed himself or use the toilet. (R. at 219.) Plaintiff could drive to doctor's appointments and make trips to the grocery store. (R. at 221.) The ALJ noted that Plaintiff tolerated a weekend trip to Philadelphia just one week before his hearing. (R. at 16.) Plaintiff noted that he spent six to eight hours per day watching television and visited his mother regularly, yet also spent four to five hours per day lying down to relieve his pain. (R. at 280.) Plaintiff reported that he could use his hands and fingers without difficulty. (R. at 45.) Plaintiff could pay bills, count change, handle a savings account and use a checkbook. (R. at 221.)

Substantial evidence also supports the ALJ's determination that Plaintiff's treatment was conservative in nature. Generally, medication and treatment improved Plaintiff's symptoms. On January 11, 2011, Plaintiff attended physical therapy, complaining of pain and stiffness in his hips, especially in the morning. (R. at 316.) Plaintiff also noted that his pain felt better throughout the day and did not feel severe at night. (R. at 316.) On August 30, 2011, Dr. Shimer noted that Plaintiff ambulated without assistance, had a strong heel-to-toe walk and had no palpable tenderness while taking Flexeril and NSAIDs. (R. at 378.) On November 18, 2011, Dr. Miller noted that Neurontin better controlled Plaintiff's burning pain. (R. at 373.) On December 19, 2011, Dr. Miller reported that "no red flags" existed with Plaintiff's strength and emphasized that Plaintiff's pain improved with Neurontin. (R. at 395.) On September 17, 2012,

Dr. Shimer reported that Plaintiff understood the benefits and risks associated with surgery yet did not want to pursue surgery. (R. at 447.) Therefore, substantial evidence supports the ALJ's credibility determination.

      C. The ALJ erred in evaluating Dr. Shimer's opinion.

      Plaintiff argues that the ALJ erred by not assessing the weight to be accorded to Dr. Shimer's opinions. (Pl.'s Mem. at 11-13.) Defendant argues that the ALJ adequately addressed Dr. Shimer's opinion by spending considerable time discussing Dr. Shimer's medical records and opinions. (Def.'s Mem. at 14-17.)

      During the sequential analysis, when the ALJ determines whether the claimant has a medically-determinable severe impairment, or combination of impairments which would significantly limit the claimant's physical or mental ability to do basic work activities, the ALJ must analyze the claimant's medical records that are provided and any medical evidence resulting from consultative examinations or medical expert evaluation that have been ordered. 20 C.F.R. § 416.912(f). When the record contains a number of different medical opinions, including those from the claimant's treating physician(s), consultative examiners or other sources that are consistent with each other, then the ALJ makes a determination based on that evidence. 20 C.F.R. § 416.927(c)(2). If, however, the medical opinions are inconsistent internally with each other, or other evidence, the ALJ must evaluate the opinions and assign them respective weight to properly analyze the evidence involved. 20 C.F.R. § 416.927(c)(2), (d).

      When considering a treating source's opinion, the ALJ must evaluate those findings just as any other medical opinion. 20 C.F.R. §§ 404.1527(e)(2)(ii); 416.927(e)(2)(ii). The ALJ must "explain in the decision the weight given to the opinions of a treating source . . ., as the [ALJ] must do for any opinions from nontreating sources and other nonexamining sources." 20 C.F.R.

§§ 404.1527(e)(2)(ii); 416.927(e)(2)(ii). Determining the specific weight of medical opinions is especially important, because the regulations further require a comparative analysis of competing medical opinions. *See, e.g.,* 20 C.F.R. § 404.1527(c)(1) ("Generally, [the Commissioner] give[s] more weight to the opinion of a source who examined [plaintiff] than to the opinion of a source who has not examined [plaintiff].")

Requiring an ALJ to assign specific weight to medical opinions is necessary, because a reviewing court "faces a difficult task in applying the substantial evidence test when the [Commissioner] has not considered all relevant evidence." *Arnold v. Sec'y of Health Educ. & Welfare,* 567 F.2d 258, 259 (4th Cir. 1977). Unless the Commissioner "has sufficiently explained the weight [s]he has given to obviously probative exhibits, to say that h[er] decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." *Id.* (quoting *Oppenheim v. Finch,* 495 F.2d 396, 397 (4th Cir. 1974)) (internal quotation marks omitted). The assignment of weight needs to be sufficiently specific "to make clear to any subsequent reviewers the weight the adjudicator gave to the . . . source's medical opinion and the reasons for that weight." SSR 96-2p (discussing affording weight to treating physician). Accordingly, a reviewing court cannot determine if substantial evidence supports an ALJ's findings "unless the [ALJ] explicitly indicates the weight given to all the relevant evidence." *Gordon v. Schweiker,* 725 F.2d 231, 235 (4th Cir. 1984) (citing *Myers v. Califano,* 611 F.2d 980, 983 (4th Cir. 1980); *Strawls v. Califano,* 596 F.2d 1209, 1213 (4th Cir. 1979); *Arnold,* 567 F.2d at 259)).

In this case, the ALJ gave no source controlling weight and had to reconcile differing medical opinions. Ultimately, the ALJ gave little weight to state agency medical consultants, because they did not have the opportunity to observe or treat Plaintiff. (R. at 17.) Although the

21

ALJ discussed Dr. Shimer's medical opinions in her decision, she never assigned a specific weight to those opinions. Thus, the ALJ erred. *See Stawls*, 596 at 1213 (finding error where Secretary failed to indicate weight afforded certain medical opinions); *Derrickson v. Astrue*, 2012 WL 3555502, at *13 (E.D. Va. June 29, 2012) (finding error where ALJ failed to afford weight to state agency physician's opinion and "seemingly afford[ed]" it greater weight than treating physician). Therefore, this Court cannot say that substantial evidence supports the ALJ's determination. *See Gordon*, 725 F.2d at 235 ("We cannot determine if findings are unsupported by substantial evidence unless the [Commissioner] explicitly indicates the weight given to all relevant evidence."). Because the ALJ did not sufficiently set forth the specific weight afforded to Dr. Shimer's opinion, the Court recommends remand to the Commissioner to indicate with explanation the specific weight. *See id.* at 236 ("We therefore remand . . with directions . . . to indicate explicitly the weight afforded to the various medical reports in the record.")

## VI. CONCLUSION

For the reasons set forth above, the Court recommends that Plaintiff's Motion for Summary Judgment (ECF No. 12) be GRANTED, that Defendant's Motion for Summary Judgment (ECF No.14) be DENIED and that the final decision of the Commissioner be VACATED and REMANDED.

Let the clerk forward a copy of this Report and Recommendation to the Honorable John A. Gibney, Jr. and to all counsel of record.

### NOTICE TO PARTIES

**Failure to file written objections to the proposed findings, conclusions and recommendations of the Magistrate Judge contained in the foregoing report within**

fourteen (14) days after being served with a copy of this report may result in the waiver of any right to a de novo review of the determinations contained in the report and such failure shall bar you from attacking on appeal the findings and conclusions accepted and adopted by the District Judge except upon grounds of plain error.

_____ /s/
David J. Novak
United States Magistrate Judge

Richmond, Virginia
Date: _____September 4, 2015_____

23